AO 257 (Rev. 6/78)

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT |
|---|

BY: ☐ COMPLAINT   ☒ INFORMATION   ☐ INDICTMENT
☐ SUPERSEDING

─── OFFENSE CHARGED ───

18 U.S.C. § 1349 - Conspiracy to Commit Wire Fraud

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY:
20 years of imprisonment;
$250,000 fine or not more than the greater of twice the gross gain or twice the gross loss ;
3 years of supervised release;
$100 special assessment

─── PROCEEDING ───

Name of Complaintant Agency, or Person (& Title, if any)
Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court
_____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District
_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE
SHOW DOCKET NO. _____

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO. _____

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
_____

Name and Office of Person Furnishing Information on this form   ALEX G. TSE
☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   Robert S. Leach

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

─── DEFENDANT - U.S ───
► Christopher Bradley Egan, aka Stouffer Egan

DISTRICT COURT NUMBER
CR17 0590
WHA

─── DEFENDANT ───

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ► ____
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

FILED
NOV 27 2017
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IS IN CUSTODY
4) ☐ On this charge
5) ☐ On another conviction     ☐ Federal   ☐ State
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution
_____

Has detainer been filed?   ☐ Yes  ☐ No
If "Yes" give date filed _____

DATE OF ARREST ► Month/Day/Year _____
Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ► Month/Day/Year _____

☐ This report amends AO 257 previously submitted

─── ADDITIONAL INFORMATION OR COMMENTS ───

PROCESS:
☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT      Bail Amount: _____
If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance
Defendant Address:
_____

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments:

Clerk

ALEX G. TSE (CABN 152348)
Attorney for the United States,
Acting Under Authority Conferred By
28 U.S.C. § 515

FILED

NOV 27 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CHRISTOPHER BRADLEY EGAN aka STOUFFER EGAN,

    Defendant.

Case No. CR 17 0590 WHA

VIOLATION: 18 U.S.C. § 1349 — Conspiracy to Commit Wire Fraud

SAN FRANCISCO VENUE

## INFORMATION

The Attorney for the United States charges:

### Introductory Allegations

At all times relevant to this Information, unless otherwise indicated:

A.    <u>Autonomy Corporation plc</u>

    1.    Autonomy Corporation plc ("Autonomy") was a company incorporated in England and Wales with a registered office in Cambridge, United Kingdom. Autonomy was the holding company of a group of companies engaged in software development and distribution. Autonomy maintained dual headquarters in San Francisco, California, and Cambridge.

///

///

///

INFORMATION

2. Autonomy's major subsidiaries included Autonomy, Inc. ("AU Inc."), with offices in San Francisco and San Jose, California; Interwoven, Inc. ("Interwoven"), with offices in San Jose; and ZANTAZ, Inc. ("Zantaz"), with offices in Pleasanton, California.

3. Autonomy was a public company whose shares were listed on the London Stock Exchange under the trading symbol "AU" and were bought, held, and sold by individuals and entities throughout the United States. In 2010, $592,358,000 of Autonomy's $870,366,000 in reported revenues (approximately 68%) came from the United States and other countries in the Americas.

4. Sushovan Tareque Hussain, a co-conspirator, was a resident of the United Kingdom. From approximately June 2001 until November 2011, he was Chief Financial Officer of Autonomy. He also was a director of Autonomy from approximately June 2003 until November 2011. Hussain was a qualified Chartered Accountant.

5. As Autonomy's most senior finance officer, Hussain was responsible for the preparation of Autonomy's financial statements.

B.   The Defendant

6. Defendant CHRISTOPHER BRADLEY EGAN aka STOUFFER EGAN was a resident of California. From approximately 2001 to 2011, he worked as a sales representative for Autonomy in the United States. In or about 2008 to 2011, EGAN was the Chief Executive Officer and head of sales for Autonomy in the United States and worked principally at Autonomy's headquarters in San Francisco, California.

C.   Hewlett-Packard Company

7. Hewlett-Packard Company ("HP") was a Delaware corporation with principal executive offices in Palo Alto, California. HP provided computing and imaging products, technologies, software, and services to customers.

8. HP was a public company whose shares were listed on the New York Stock Exchange under the trading symbol "HPQ" and were bought, held, and sold by individuals and entities throughout the United States. HP securities were registered with the Securities and Exchange Commission under Section 12 of the Securities Exchange Act of 1934.

///

INFORMATION                                2

D.   HP's Purchase of Autonomy

9.   On or about August 18, 2011, HP and Hewlett-Packard Vision B.V. ("HP Vision"), an indirect wholly-owned subsidiary of HP, entered into an Offer Agreement with Autonomy and publicly announced an offer to acquire Autonomy for approximately $11 billion.

10.   On or about August 18, 2011, in a press release announcing the acquisition, HP emphasized that "Autonomy's recent operating and financial performance has been strong." HP also stated that "[o]ver the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." Among the acquisition's "[s]trategic and financial benefits," HP said Autonomy would enhance HP's financial profile because "Autonomy's strong growth and profit margin profile complement[ed] HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy [had] … a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."

11.   Under the terms of the offer, HP, through HP Vision, offered to buy all the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash.

12.   On or about October 3, 2011, when all conditions relating to the offer had been satisfied, HP's acquisition of Autonomy closed and HP acquired control of Autonomy.

E.   Autonomy's Financial Statements

13.   From in or about 2004 to in or about July 2011, Autonomy issued quarterly and annual financial statements to the investing public in the United Kingdom, the United States, and other places. In its statements to the public, Autonomy said that the financial statements were prepared in accordance with regulations for public companies in the United Kingdom. Autonomy also stated that its annual financial statements were audited, and its quarterly financial statements were reviewed, by an independent auditor in the United Kingdom.

14.   In its quarterly and annual reports, Autonomy stated that its financial statements had been prepared in accordance with International Financial Reporting Standards ("IFRS") and, in particular, the accounting requirements for revenue recognition defined by International Accounting Standard 18 –

Revenue ("IAS 18"). In its quarterly and annual financial statements, Autonomy made statements about the "revenue" it recognized in the quarter and its "gross margin," an alleged measure of its profitability.

15. For example, Autonomy, in its quarterly financial statements, claimed to have revenue (in millions of U.S. dollars) and a gross margin in the approximate amounts specified below:

| Quarter | Revenue | Gross Margin |
|---------|---------|--------------|
| Q1 2009 | $129.8  | 91%          |
| Q2 2009 | $195.2  | 89%          |
| Q3 2009 | $191.6  | 85.6%        |
| Q4 2009 | $223.1  | 89.4%        |
| Q1 2010 | $194.2  | 88.9%        |
| Q2 2010 | $221.1  | 86.3%        |
| Q3 2010 | $210.6  | 87.6%        |
| Q4 2010 | $244.5  | 86.3%        |
| Q1 2011 | $219.8  | 88.3%        |
| Q2 2011 | $256.3  | 87.1%        |

16. In its annual reports and elsewhere, Autonomy held itself out as a "pure software" company. For example, in its 2009 annual report, Autonomy claimed it "operates in the realm of pure software." It stated: "Autonomy is one of the very rare examples of a pure software model."

F. HP Relied on Autonomy's Financial Statements

17. Between January and August 2011, Autonomy representatives gave and otherwise provided Autonomy's financial statements and documents reflecting Autonomy's results for the year ended 2009, the year ended 2010, the first half of 2011, and other periods to persons at, or acting on behalf of, HP in the course of HP's consideration of whether to buy Autonomy and, if so, for what price.

18. Among other information, HP relied on the accuracy and truthfulness of the statements and disclosures made in Autonomy's historically reported financial statements including, but not limited to, Autonomy's claims about its financial performance and revenues and its claim to be a "pure software" company with high gross margins.

INFORMATION                                    4

<u>The Scheme to Defraud</u>

19. In or about Autonomy's first quarter 2009, which began in January of 2009, EGAN, together with others, including Hussain, engaged in a fraudulent scheme to deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its financial condition, and its prospects for growth.

20. The objectives of the scheme to defraud were, among other things, to ensure that Autonomy reported that it had met or exceeded projected quarterly results for, among other things, revenue, gross margin, net income, and earnings per share, and to artificially increase and maintain the share price of Autonomy securities.

21. In or about early 2011, Hussain, and others, met with representatives of HP about a potential acquisition of Autonomy by HP. At or about that time, Hussain, and others, used Autonomy's false and misleading financial statements from 2009, 2010, and early 2011 to make Autonomy more attractive to a potential purchaser like HP.

22. In furtherance of the scheme to defraud, EGAN used a variety of means and methods, including:

    a. Artificially inflating revenues by, among other things, (i) backdating written agreements to record revenue in prior periods; (ii) recording revenue on contracts that were subject to side letters or other agreements with contingencies or other terms impacting revenue recognition; (iii) recording revenue for reciprocal or roundtrip transactions whereby Autonomy granted a software license to a counterparty which purchased product or services from Autonomy at a greater price; (iv) recording revenue where all of the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had not been satisfied; and (v) structuring or restructuring contracts to accelerate revenue recognition while reducing future recurring revenue;

    b. Making false and misleading statements to Autonomy's independent auditor about the facts and circumstances of transactions allegedly supporting the recognition of revenue, expenses, costs, and other items in Autonomy's financial statements, including, but not limited to, backdating contracts, invoices, agreements, and other documents in order to make it appear that they had been reached with a counterparty in a prior period; and

INFORMATION                                    5

        c.    Facilitating the issuance of materially false and misleading quarterly and annual reports.

23. As part of the scheme to defraud, Hussain, and others, caused Autonomy to make materially false and misleading statements directly to HP regarding Autonomy's financial condition, performance, and business, including:

        a.    Making false and misleading statements regarding the nature of Autonomy's products and concealing Autonomy's non-appliance hardware sales;

        b.    Making false and misleading statements regarding Autonomy's top customers;

        c.    Making false and misleading statements regarding Autonomy's top contracts; and

        d.    Making other false and misleading statements during HP's "due diligence" about Autonomy prior to announcing the acquisition.

**COUNT ONE:**    (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

24. The factual allegations in Paragraphs 1 through 23 are re-alleged and incorporated by reference.

25. Beginning in or about Autonomy's first quarter 2009, which began in January of 2009, and continuing until in or about October 2011, in the Northern District of California and elsewhere, the defendant,

                CHRISTOPHER BRADLEY EGAN aka STOUFFER EGAN,

and others, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

                <u>Means and Methods of the Wire Fraud Conspiracy</u>

26. In furtherance of the conspiracy and to effect the objectives thereof, on or about the dates listed below, in the Northern District of California and elsewhere, EGAN, and others, used the following means and methods, among others:

a.  On or about April 23, 2009, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2009.

b.  On or about July 16, 2009, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2009.

c.  On or about October 20, 2009, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2009.

d.  On or about December 31, 2009, EGAN signed a First Amendment to License and Distribution Agreement with a counterparty in the United States whereby the counterparty licensed "EDD" or electronic data discovery software for approximately $4 million plus maintenance and support.

e.  On or about February 3, 2010, Autonomy issued a press release about, among other things, its financial performance in the fourth quarter (year-end) of 2009.

f.  On or about February 22, 2010, Autonomy issued its Annual Report and Accounts for the year ended 31 December 2009.

g.  On or about March 10, 2010, Autonomy paid a counterparty $1,425,000, by means of a check written on an account maintained at a financial institution in San Francisco, for "EDD Processing" that was not performed.

h.  On or about April 1, 2010, EGAN called the principal of a counterparty in the United States and asked if the counterparty would agree to a transaction to license software from Autonomy, which ultimately was recorded as revenue in the first quarter of 2010.

i.  On or about April 21, 2010, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2010.

j.  On or about July 22, 2010, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2010.

k.  On or about October 19, 2010, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2010.

INFORMATION                               7

l.   On or about January 18, 2011, Hussain caused an Autonomy employee in San Francisco to backdate a draft, unexecuted license agreement with a counterparty.

m.   On or about January 26, 2011, EGAN and Hussain caused an Autonomy officer to email a backdated license agreement to Autonomy's independent auditors.

n.   On or about February 1, 2011, Autonomy issued a press release about, among other things, its financial performance in the fourth quarter (year-end) of 2010.

o.   On or about February 22, 2011, Autonomy issued its Annual Report and Accounts for the year ended 31 December 2010.

p.   On or about April 4, 2011, EGAN directed a counterparty to prepare and backdate an agreement to license Autonomy software, which ultimately was recorded as revenue in the first quarter of 2011.

q.   On or about April 14, 2011, EGAN and Hussain met in San Francisco with the counterparty and discussed a backdated licensing agreement.

r.   On or about April 21, 2011, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2011.

s.   On or about July 27, 2011, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2011.

All in violation of Title 18, United States Code, Section 1349.

DATED: November 27, 2017

ALEX G. TSE
Attorney for the United States,
Acting Under Authority Conferred By
28 U.S.C. § 515

_____
JOHN HEMANN
Deputy Chief, Criminal Division

(Approved as to form: ___Robert Leach___)
AUSA ROBERT S. LEACH

(Approved as to form: ___Adam Reeves___)
AUSA ADAM A. REEVES

INFORMATION                                                    8